UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES ROACH,

       Plaintiff,                                       Hon. Janet T. Neff

v.                                                  Case No. 1:14-CV-222

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits and Supplemental Security Income benefits under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security

case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

**PROCEDURAL POSTURE**

Plaintiff was 44 years of age on his alleged disability onset date. (Tr. 166). He successfully completed high school and previously worked as a salvage laborer, parking lot attendant, and dryer operator. (Tr. 26). Plaintiff applied for benefits on November 30, 2010, alleging that he had been disabled since October 1, 2007, due to gout, arthritis, bunions, and "bad disks" in his back. (Tr. 166-80, 208). Plaintiff's applications were denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 87-165). On August 31, 2012, Plaintiff appeared before ALJ Michael Condon with testimony being offered by Plaintiff and a vocational expert. (Tr. 33-86). In a written decision dated October 19, 2012, the ALJ determined that Plaintiff was not disabled. (Tr. 17-27). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-5). Plaintiff subsequently initiated this pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

**RELEVANT MEDICAL HISTORY**

On March 6, 2006, Plaintiff participated in a three phase bone study of his left foot the results of which revealed the following:

1. Mild degenerative radiotracer uptake in the hind and midfeet.

2. Scintigraphic findings suspicious of sesamoiditis.[1]

---

[1] The sesamoid bones are "embedded in a tendon. . .in the ball of the foot, beneath the big toe joint." *See* Sesamoid Injuries in the Foot, available at http://www.foothealthfacts.org/footankleinfo/Sesamoid_Injuries.htm (last visited on February 3, 2015). Sesamoiditis is an "overuse injury involving chronic inflammation of the sesamoid bones and the tendons involved with those bones." The pain usually occurs "with certain shoes or certain activities." *Id.*

>       3.      No scintigraphic evidence of fracture or other more significant active bony lesion.

(Tr. 296).

On December 20, 2007, Plaintiff reported to the hospital complaining of left foot pain which he described as "quite painful, hot, burning sensation, swollen, very much like gout[2] in the past." (Tr. 264-65). An examination of Plaintiff's foot revealed the following:

> Patient appears to be in acute distress. Otherwise, well-developed and well-nourished in appearance. Nontoxic in appearance. Not in any acute respiratory distress. Examination of the lower extremities, there is no redness noted over the left versus the right foot, although the left foot is taunt and swollen, and certainly quite acutely painful to any form of palpation over the MTP joints and over the lateral aspect of the foot, palpation of the bones. There is no puncture wounds or soft-tissue breakdown of the foot. He has full range of motion of the ankle with increased discomfort to inversion and eversion of the foot and certainly weightbearing. There is no red tracking. There is no lymphadenitis. Heart regular rate and rhythm without murmurs. Blood pressure 151/100, pulse 120. Recheck was at 100. Respiratory was 20, temperature 97.8 degrees Fahrenheit. Pulse ox at 96%. Weight at 244 pounds.

(Tr. 264). Plaintiff was diagnosed with "gouty arthritis" and prescribed indomethacin[2] and Vicodin. (Tr. 264-65).

Treatment notes dated April 16, 2008 indicate that Plaintiff was diagnosed with gout of the right great toe for which he was prescribed several medications including Vicodin. (Tr. 283-84). Treatment notes indicate that between April 28, 2008, and June 12, 2008, Plaintiff's Vicodin

---

[2] Gout is a form of "inflammatory arthritis that causes sudden, severe pain, swelling and tenderness - most often in the large joint of the big toe." *See* Gout, available at http://www.arthritis.org/arthritis-facts/disease-center/gout.php (last visited on February 3, 2015). While gout "can affect other joints...[i]t usually affects only one joint at a time." Moreover, "[a]lthough gout is chronic, it can be controlled" with "medication and lifestyle changes." *Id.*

[2] Indomethacin is a nonsteroidal anti-inflammatory drug that "works by reducing hormones that cause inflammation and pain." *See* Indomethacin, available at http://www.drugs.com/mtm/indomethacin.html (last visited on February 3, 2015). Indomethacin is used to treat pain or inflammation caused by many conditions including gout. *Id.*

4

prescription was refilled on three separate occasions. (Tr. 277-82). Treatment notes dated July 28, 2008, indicate that Plaintiff's doctor "cannot seem to get through to [Plaintiff] that Vicodin is not helping him. He is so focused on his pain that he can't wrap his brain around the concept of treating the cause and getting good diagnosis with xray of foot." (Tr. 276). Treatment notes dated September 10, 2008 indicate that Plaintiff was provided a supply of 100 Vicodin tablets. (Tr. 273-74). Treatment notes dated November 10, 2008, indicate that Plaintiff's Vicodin prescription was refilled again. (Tr. 271-72).

On March 31, 2010, Plaintiff reported to the emergency room complaining of mouth and back pain. (Tr. 294). Plaintiff was provided a prescription of Vicodin. (Tr. 295).

On July 12, 2010, Plaintiff reported to the emergency room complaining of back and leg pain. (Tr. 301). Plaintiff reported that he had been experiencing back pain for the previous two months and that "nothing seems to make it better." (Tr. 301). Plaintiff reported that "he has actually tried some Vicodin of his girlfriend's at home with minimal relief." (Tr. 301). An examination of Plaintiff's back revealed the following:

> Back - there is some minimal lumbar tenderness on the right. Strength is 5/5 about the hamstrings, quadriceps, gastrocs, EHLs bilaterally. Sensation is normal at L3, L4, L5 , and S1 dermatomes on the left. It is decreased at L3 on the right but normal on L4, L5, and S1 on the right.

(Tr. 301). Plaintiff was diagnosed with acute back pain and provided prescriptions for ibuprofen and Vicodin. (Tr. 301).

On August 13, 2010, Plaintiff reported to the emergency room complaining of back pain. (Tr. 305). The examining physician observed the following:

5

> The patient is very fixated on receiving Vicodin, asking me when I initially arrived and intermittently throughout my questioning. States that he took a friend's Vicodin which seemed to help, but also states later in the interview that he would like very strong Vicodin as his friend's Vicodin did not help enough. The patient is supposed to be on antiinflammatories but has not been taking them. States that he is unable to walk and he can not stand, however, upon calling triage, the patient walked in on his own volition, although he did walk in with a limp.

(Tr. 305). A physical examination revealed the following:

> Vital signs - are reviewed and within normal limits. HEENT - pupils are equal. Mucous membranes moist. Heart - regular rate and rhythm, no murmur, gallop, or rubs. Lungs - clear. GI - nontender, no costovertebral tenderness. Musculoskeletal - he appears to have pain from the midthoracic spine all the way to the lumbar spin[e]. I am unable to locate a point of maximal tenderness. The patient has 5/5 strength in L1 through S1 distribution. Extremities - bilateral extremities with hip flexion, extension, foot dorsal and plantar flexion. Sensation to light touch appears intact over the enter leg, knee and in both inner and outer thigh, inner and outer shin and both sides of the foot. I attempted to stand the patient. He was able to stand while leaning over on a bench. The patient kept his right foot dorsal flexed during this procedure. The patient was unwilling to ambulate for me on my initial test, but again, was able to ambulate when entering the department.

(Tr. 305).

Plaintiff was diagnosed with low back pain and given a prescription for ibuprofen. (Tr. 305-06). Plaintiff's request for Vicodin was refused. (Tr. 306). Specifically, the doctor "spent multiple visits with [Plaintiff] describing that this is an inflammatory injury and will require long-term antiinflammatories, physical rehab and followup with a regular physician." (Tr. 306). The doctor further observed that Plaintiff "was able to ambulate to leave the department." (Tr. 306).

On February 10, 2011, Plaintiff participated in an MRI examination of his lumbar spine the results of which revealed the following:

6

> At L5-S1, there is hypertrophic narrowing of the neural foramina which is more severe the right. There also appears to be asymmetric effacement of the right L5 nerve root. The left L5 nerve root exits normally.
>
> There are endplate irregularities which appear developmental. Vertebral body height, alignment, and interspacing [are] otherwise within normal limits. No disc protrusion or spinal stenosis is present. No significant marrow abnormality is identified and the conus medullaris appears normal.

(Tr. 357).

On February 28, 2011, Plaintiff participated in a consultive examination conducted by Neil Reilly, M.A., LLP. (Tr. 311-16). Plaintiff reported that he was disabled due to back pain and gout. (Tr. 311). The results of a mental status examination were unremarkable. (Tr. 313-15). Plaintiff was diagnosed with: (1) mood disorder secondary to back pain with depressed mood - mild; and (2) cognitive disorder not otherwise specified. (Tr. 315). Plaintiff's GAF score was rated as 54.[3] (Tr. 315). Reilly concluded that:

> The prognosis for [Plaintiff] is good from a psychological perspective. His mood problems seem mild and are secondary to his pain. He still manages his daily activities, but does things in bits and pieces. His psychological functioning seems stable. There is a suggestion of intellectual limitations that might limit the scope of his work, but would not preclude him from working. His primary issues are physical in nature and that is the most significant limiting factor toward his employability.

(Tr. 315).

---

[3] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 54 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

On March 3, 2011, Plaintiff participated in a consultive examination conducted by Dr. Danelle Kutner. (Tr. 318-20). Plaintiff reported that he was disabled due to back and foot pain. (Tr. 318). A musculoskeletal examination revealed the following:

> There are no obvious bony deformities. Range of motion was decreased in the lumbar spine. There is tenderness to palpation over the lumbar spine in the right paraspinal area. He does not have a paraspinal muscle spasm noted. There is tenderness to palpation over the 1st phalanx of his feet bilaterally on the medial portion. There is mild swelling on the right 1st phalanx mostly noted on the great toe. He does not have any warmth noted. Peripheral pulses are easily palpated and symmetrical. There is no evidence of varicose veins. Grip strength is unimpaired. The hands have full dexterity. Straight leg raising test was negative. The patient had no difficulty getting on and off the exam table.

(Tr. 319). A neurological examination revealed the following:

> Motor strength remains intact at 5/5. Reflexes are 2/4 and symmetrical. There is no loss of sensation. No disorientation is noted.

(Tr. 320).

Dr. Kutner concluded as follows:

1. Back pain. This is most likely secondary to degenerative joint disease, though patient may have disc herniation involved. He does not have any neuro deficits on examination today, though he does have limitation in range of motion of his lumbar spine.

2. Foot pain. The patient does have evidence of some swelling on the right great toe which is most likely his bunion reoccurring. It does not appear to be gouty in nature, though patient does have a history of gout.

(Tr. 320).

On February 23, 2012, Plaintiff began treating with Dr. Walid Nader. (Tr. 344-45). The results of an initial physical examination were unremarkable. (Tr. 344-45). Plaintiff was prescribed several medications including Vicodin. (Tr. 345). Treatment notes dated March 8, 2012, indicate that Plaintiff was "feeling well without any specific complaints." (Tr. 343). Treatment notes dated March 22, 2012, indicate that Plaintiff was "feeling well without any specific complaints." (Tr. 343). Treatment notes dated April 5, 2012, indicate that Plaintiff was provided another prescription for Vicodin. (Tr. 342-43). Plaintiff's Vicodin prescription was refilled again on April 19, 2012 and again on May 2, 2012. (Tr. 341-42). Treatment notes dated May 16, 2012, indicate that Plaintiff was "feeling well without any specific complaints." (Tr. 340). Plaintiff's Vicodin prescription was refilled again. (Tr. 340). Treatment notes dated May 30, 2012, indicate that Plaintiff was "feeling well without any specific complaints." (Tr. 339). Plaintiff's Vicodin prescription was refilled again. (Tr. 340). Plaintiff's Vicodin prescription was refilled on four separate occasions between June 13, 2012, and July 30, 2012. (Tr. 336-38).

On August 20, 2012, Dr. Nader completed a one page form regarding Plaintiff's physical capacities. (Tr. 356). The doctor reported that during an 8-hour workday, Plaintiff can "sometimes" sit, but can "never" stand, walk, bend, stoop, or lift up to 10 pounds. (Tr. 356). The doctor reported that Plaintiff would experience "serious limitations as to pace and concentration" and "would need a sit-stand option." (Tr. 356). The doctor also concluded that due to his symptoms, Plaintiff "would likely miss 3 days or more of work and be tardy 3 or more days per month." (Tr. 356).

## **ANALYSIS OF THE ALJ'S DECISION**

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*,

---

[4] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from: (1) mood disorder secondary to back pain with depressed mood; (2) mild cognitive disorder, not otherwise specified; (3) degenerative joint disease of the lumbar spine; (4) right foot bunion; (5) great toe gout on the right foot; and (6) obesity, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 19-22). The ALJ next determined that Plaintiff retained the capacity to perform light work[5] subject to the following limitations: (1) he can stand or walk for no more than two hours during an 8-hour workday; (2) he can occasionally balance, stoop, and crouch; (3) he cannot kneel, crawl, or climb ladders, ropes, and scaffolds; (4) he cannot operate leg or foot controls with his right lower extremity; and (5) he is limited to simple unskilled work. (Tr. 22).

The ALJ found that Plaintiff cannot perform his past relevant work at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y*

---

[5] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983); *Van Winkle v. Commissioner of Social Security*, 29 Fed. Appx. 353, 357 (6th Cir., Feb. 6, 2002).

*of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert at the administrative hearing.

The vocational expert testified that there existed in the lower peninsula of Michigan approximately 7,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 75-82). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The vocational also testified that if Plaintiff were further limited to sedentary work, there existed approximately 5,600 jobs which Plaintiff could perform consistent with his RFC. (Tr. 82-83). The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

I.      **The ALJ Properly Assessed the Medical Evidence**

As noted above, Dr. Nader completed a single-page form concerning Plaintiff's residual functional capacity concluding that Plaintiff's ability to function was far more limited than recognized by the ALJ. For example, Dr. Nader reported that Plaintiff can only sometimes sit and can never stand, walk, bend, stoop, or lift up to 10 pounds. The doctor reported that Plaintiff would experience "serious limitations as to pace and concentration" and "would need a sit-stand option." The doctor also concluded that due to his symptoms, Plaintiff "would likely miss 3 days or more of

work and be tardy 3 or more days per month." The ALJ accorded only "limited weight" to Dr. Nader's opinions. (Tr. 24). Plaintiff argues that he is entitled to relief because the ALJ improperly discounted the opinions from his treating physician.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

In support of his decision to discount Dr. Nader's opinions, the ALJ offered the following observations:

> Walid Nader, M.D., the claimant's primary care provider, treated the claimant from February 2012 through July 2012 on a bi-weekly basis. He diagnosed the claimant with degeneration of the lumbar or lumbosacral intervertebral disc, osteoarthritis generalized involving multiple sites, gouty arthropathy unspecified and benign hypertension. However, he noted the only conditions resulting in limitations were osteoarthritis and disc disease. Dr. Nader

>documented that the claimant noted feeling well without any specific complaints on multiple visits; however, the claimant was seeking a Vicodin refill during each visit. Physical examinations were normal and exercise was advised. The claimant was also prescribed Adderall although he testified that. . .his Medicaid card did not cover the medication and he could not afford it. Dr. Nader opined that the claimant's condition was permanent and that he could sit no more than two hours in an eight-hour workday, never stand or walk, lift 10 or more pounds, bend or stoop. Additionally, the claimant would have serious limitations as to pace and concentration, would need a sit-stand option, would likely miss three days or more of work and be tardy three or more days per month, would be best suited for part-time work, would need breaks as symptoms dictate and the combined effects of these impairments is greater than the effect of each impairment considered separately. This opinion is given little weight. Dr. Nader's treatment was conservative in nature, consisting primarily of medication. There were no specialized tests or imaging performed. Therefore, his opinion appears based on the claimant's subjective complaints and not on his own treatment records which do not support such restrictive findings.

(Tr. 24).

Plaintiff advances two arguments in support of his claim that the ALJ erred in his evaluation of Dr. Nader's opinion. Plaintiff asserts that the ALJ's conclusion is based upon "a mischaracterization of the record" and, moreover, "was not sufficiently specific to permit meaningful appellate review." (Dkt. #13 at PageID#404).

As noted immediately above, in assessing Dr. Nader's opinion, the ALJ observed that "[t]here were no specialized tests or imaging performed." As the above discussion of the medical evidence reveals, however, Plaintiff did participate in an MRI examination on February 10, 2011. According to Plaintiff, this apparent disparity renders infirm the ALJ's decision. The Court is not persuaded and instead finds that Plaintiff's argument takes the ALJ's comment out of context.

The ALJ did not ignore or disregard Plaintiff's February 10, 2011 MRI. In his discussion of the medical evidence, the ALJ specifically discussed the results of this particular examination. (Tr. 23). This MRI, however, was not performed at the behest of Dr. Nader, but was instead performed approximately one year before Plaintiff began treating with Dr. Nader. A review of Dr. Nader's treatment notes makes no mention of this MRI examination. (Tr. 334-45). Likewise, the form which Dr. Nader completed expressing his opinions makes no mention of this MRI. (Tr. 356). Finally, there is no evidence that Dr. Nader ever directed or requested that Plaintiff participate any type of specialized test or imaging. Thus, the ALJ's statement is not properly interpreted as an assertion that Plaintiff never participated in an MRI examination, but instead constitutes an observation by the ALJ that Dr. Nader, in formulating his opinion, did not rely on the results of any specialized tests or imaging.

Dr. Nader consistently reported that Plaintiff was "feeling well without any specific complaints." Moreover, as the ALJ recognized, "Dr. Nader's treatment was conservative in nature, consisting primarily of medication." These particular conclusions, which undermine the doctor's subsequent opinion, are amply supported by the record as discussed herein. Thus, the ALJ's conclusion that the doctor's opinion appears to have been based on Plaintiff's subjective complaints, rather than his own findings, is supported by the evidence.

As for Plaintiff's argument that the ALJ's decision is not sufficiently specific to permit meaningful appellate review, the Court is equally unpersuaded. The Court discussed at length the evidence of record and as noted above, the ALJ specifically discussed the results of Dr. Nader's examinations, the specifics of the doctor's subsequent opinion, and why the doctor's opinion was

contradicted by the evidence of record. In sum, the ALJ's decision to discount Dr. Nader's opinions complies with the relevant legal standard and is supported by substantial evidence.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: February 13, 2015                     /s/ Ellen S. Carmody
                                            ELLEN S. CARMODY
                                            United States Magistrate Judge